STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

05-1178

ALBERT L. ROBERTS, JR., ET UX.

VERSUS

HARTFORD FIRE INS. CO., ET AL.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 210,885
HONORABLE HARRY F. RANDOW, DISTRICT JUDGE

**********

ELIZABETH A. PICKETT
JUDGE
**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and J. David Painter, Judges.

REVERSED AND RENDERED.

Kay H. Michiels
Walker, Passman & Michiels
P. O. Box 13020
Alexandria, LA 71315-3020
Counsel for Defendants/Appellants:
    Brookshire Grocery Company and
    Nutmeg Insurance Company

Wesley J. Gralapp
Neblett, Beard & Arsenault
P. O. Box 1190
Alexandria, LA 71309
Counsel for Plaintiffs/Appellees:
    Albert L. Roberts, Jr. and
    Judy Roberts

**Pickett, J**.

The defendants, Brookshire Grocery Company (Brookshire), d/b/a Super One Foods (Super One), and its insurer, Nutmeg Insurance Company (erroneously referred to as Hartford Fire Insurance Company), appeal a judgment of the trial court finding them liable for damages the plaintiff, Judy Roberts, sustained as a result of a slip and fall in the Pineville, Louisiana Super One store on October 6, 2002, and Albert L. Roberts Jr., Mrs. Roberts' husband, for loss of consortium. We reverse the judgment of the trial court and render judgment in favor of the appellants.

## FACTS

The following facts in this case are uncontroverted. Mrs. Judy Roberts slipped and fell in a puddle of water on the floor of Super One Foods in Pineville on October 6, 2002, at approximately 8:40p.m. The puddle was near the bakery section of the store and resulted from the over-flow of a blocked drain underneath a refrigerated display case.

## LAW AND DISCUSSION

In its written reasons for judgment, the trial court stated the following:

> In their original post-trial briefs, the parties discussed the applicability of La.R.S. 9:2800.6 to the facts of this case. On its own motion, the Court requested that the parties submit supplemental briefs on the applicability of La.C.C. art. 2317.1 instead. The Court believes and both parties agree [We find no evidence that the defendants ever agreed that the burden of proof established by La.R.S. 9:2800.6 is inapplicable to this case.] that since this is a defect "in the premises" and not "on the premises," Brookshire's liability is governed by La.C.C. art. 2317.1, which provides as follows:
>
>> The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice or defect, only upon showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he

1

failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitor in an appropriate case.

We find that the trial court's reliance on La.Civ.Code art. 2317.1 was legal error. Louisiana Revised Statutes 9:2800.6 states as follows (emphasis ours):

A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.

B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a *fall due to a condition existing in or on a merchant's premises*, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:

(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.

(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.

(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.

C. Definitions:

(1) "Constructive notice" means the claimant has proven that the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care. The presence of an employee of the merchant in the vicinity in which the condition exists does not, alone, constitute constructive notice, unless it is shown that the employee knew, or in the exercise of reasonable care should have known, of the condition.

(2) "Merchant" means one whose business is to sell goods, foods, wares, or merchandise at a fixed place of business. For purposes of this Section, a merchant includes an innkeeper with respect to those areas or aspects of the premises which are similar to those of a merchant,

2

including but not limited to shops, restaurants, and lobby areas of or within the hotel, motel, or inn.

D. Nothing herein shall affect any liability which a merchant may have under  Civil Code Arts. 660, 667, 669, 2317, 2322, or 2695.

The rules of statutory construction are well settled: "Pursuant to general rules of statutory construction, 'where two statutes deal with the same subject matter, they should be harmonized if possible; however, if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character.'" *Filson v. Windsor Court Hotel*, 04-2893, p. 4 (La. 6/29/05), 907 So.2d 723, 726 (quoting *City of Pineville v. Am. Fed'n of State, County, and Mun. Employees, AFL-CIO, Local 3352*, 00-1983, p. 4 (La. 6/29/01), 791 So.2d 609, 612).  Since La.R.S. 9:2800.6 deals specifically with "a negligence claim brought against a merchant . . . for damages as a result of an injury . . .sustained because of a fall due to a condition existing in or on [the defendant] merchant's premises" it must be applied and the application of any other law was a reversible error of law.

"[W]hen the court of appeal finds that a reversible error of law . . . was made in the trial court, it is required, whenever possible, to redetermine the facts de novo from the entire record and render a judgment on the merits." *Ferrell v. Fireman's Fund Ins. Co.*, 94-1252, p. 4 (La. 2/20/95), 650 So.2d 742, 745 (citing *Rosell v. ESCO*, 549 So.2d 840 (La.1989) and *Gonzales v. Xerox Corp.*, 320 So.2d 163 (La.1975)).  Thus we must undertake a de novo review of the record.

Mrs. Roberts testified that she and her husband were on the way home from her brother's house when she remembered that she was out of coffee creamer.  The couple decided to stop at Super One.  Mr. Roberts remained in their vehicle while

3

Mrs. Roberts went into the store. She stated that since she was just going for one item, she left her purse in the truck and just took a five dollar bill with her into the store. Mrs. Roberts stated that she

> "walked straight to the back of the store, took a left, [and] went to the dairy center. . . . . Got my milk, came around . . . . —I don't know why I didn't go back the same way I came in, but I came back around the bakery—the— some counter that had some cakes and stuff on it, and after that, the next thing I remember I was on the floor.

Mrs. Roberts testified that before her fall she saw no spills, no "Wet Floor" signs, mop buckets, or the like. She stated that assumed that the puddle in which she slipped was water because it was wet and clear. She testified that after the fall her feet, but not her clothes, were wet.

At the time of the accident, Dean Schwieso, a friend of the Roberts, was shopping near the area where Mrs. Roberts fell. He testified that he did not see her fall but heard a "pretty loud" thump as she hit the floor. Mr. Schwieso immediately went to the area. When asked if he noticed anything which may have caused Mrs. Roberts' fall, he replied: "[I]t looked like a stream of water with a kind of puddle area there by the display. . . . . [T]here was like a stream of water going from that [display case], from underneath there." Mr. Schwieso stated that he could not remember the size of the puddle, and, to the best of his recollection, the puddle was clear and clean, and free of footprints or buggy tracks.

Albert Roberts, the husband of the victim, was summoned to the scene by a Super One employee. He also stated that the puddle was clear and clean. He estimated that it came out two to two-and-one-half feet from the cooler. Mr. Roberts testified that he could not remember the presence of footprints, buggy tracks or dirt

4

in the puddle stating: "I didn't really look for them." He further stated that he had no idea how long the puddle had been on the floor.

Darlene Patin, a bakery clerk, was working in the area at the time of the accident. Ms. Patin testified that Hurricane Lily had recently come through the Pineville area dumping excessive amounts of rain. The copious rainfall resulted in leaks in the Super One roof in the bakery department area. Ms. Patin stated that, upon reporting for work on the day of the accident, she had been instructed by Vickie Brown, her department head, to keep a sharp look-out for water on the floor and to "keep the water up." She also stated that, because of the leaky roof, she had placed "wet floor signs so they could be visible at all angles" throughout the bakery department. In connection with her testimony, Ms. Patin produced a drawing which was placed into evidence. The drawing showed the area from the meat department, on one side of the bakery department to the cooler in front of which Ms. Roberts slipped and fell. It depicts an area of twelve tables arranged in three rows of four tables each with six warning signs inter-dispersed among the tables. At least one of these signs appears to be within ten feet of where Ms. Roberts fell.

Mr. Patin testified that she was on the opposite side of the bakery department, near the meat department, when Mrs. Roberts fell. She stated that she did not see Mrs. Roberts fall, but did hear her hit the floor. Ms. Patin went to Mrs. Roberts' aid and summoned other Super One employees to the scene. She explained that for the prior two hours she had been in and out of the freezer pulling merchandise and putting it on display. She said that she had not noticed a puddle in front of the cooler where Mrs. Roberts fell, and that, if she had, she would have placed a safety cone over the puddle until it could be cleaned up. As to the puddle, itself, Ms. Patin

5

described it as about the size of "one of our baking pans. . . . I want to say it was about 12″ x 16″, but that would have covered the entire spot." She described it further as being hard to see—clear and clean and "[b]etween the lighting and the floor color and all, you just couldn't see it." She also testified that she did not observe any footprints or buggy tracks through the puddle and that she was not aware of any problem with the floor drain either before or since the accident.

Alphonso Lenyard, the assistant manager of the Pineville Super One, one of the people summoned by Ms. Patin was in the main isle near the meat department at the time of the accident. He also heard Mrs. Roberts hit the floor and was on the way when Ms. Patin called to him. When he arrived at the scene, he observed Mrs. Roberts in obvious pain and after consulting with her summoned an ambulance. He also described the puddle as clean and clear. Mr. Lenyard subsequently discovered that the puddle in which Mrs. Roberts fell was the result of a clogged drain. He used a coat-hanger to clear the clog and then checked all the drains in the store, just to make sure they "didn't have any other problems anywhere else." He stated that this was the first time in fifteen years with the company that he had checked any drain. He explained that Brooksire's department in Tyler, Texas was responsible for drain maintenance and that "every year somebody comes and cleans the drains." He stated that to the best of his knowledge this was the only drain problem the store had encountered. The plaintiffs then introduced a number of service invoices from Andrew Refrigeration for work done at that store both before and after this accident. The nature of the work reflected by these invoices was subsequently explained by Michael Gregory, the refrigeration and equipment warehouse manager for Brookshire Grocery Company at its Tyler, Texas facility.

6

The plaintiffs next called James Pate Jr., a plumbing contractor. He inspected the drain which caused the accident and took numerous photographs of the accident scene. He stated that the drain in question was a pit drain, took measurements and determined that if the drain became clogged it would hold 7.48 gallons of water before it would overflow. He noted that there was a solid cover on the drain and opined that a grated cover would make inspecting the drain easier. He said that he recommended grated covers to his customers. Mr. Pate testified that refrigeration drains were prone to algae growth, which can stop-up the drain. On cross examination, he admitted that he had no experience installing refrigeration drains, that he couldn't attribute the clog in the Super One drain to algae build-up, and that although he did work for Albertson's and Kroger he neither did regular maintenance on their floor drains nor provided any regular drain service.

The last witness to testify was Michael Gregory, who we mentioned earlier. Mr. Gregory has a degree in air conditioning and refrigeration and is a licensed air conditioning, refrigeration, heating, and cooling contractor in both Texas and Arkansas. Mr. Gregory was instrumental in building the Pineville Super One store and was present when the refrigeration equipment was installed. He explained that Brookshire used pit drains because they were almost trouble free, requiring very little maintenance. He reviewed the service invoices from Andrew Refrigeration, explaining the problem and remedy on each invoice. Several were for stopped up case drains. Two were for stopped up air conditioning drains. One was for a stopped up drain in the area where meat is prepared. Only one call involved a stopped up floor drain. He stated that Brookshire has an independent company, Martin Refrigeration, to service all of its stores and that the stores are serviced on a rotating

7

basis. Martin comes in and cleans all the refrigeration equipment, coils, fixture drains, floor drains, etc. The rotation takes about twelve months.

Mr. Gregory agreed with Mr. Pate that the pit on the floor drains would hold about 7.48 gallons of water. He stated that the 7.48 gallons of water in a pit would exert over fifty pounds of pressure on any clog and, thus, were for the most part self cleaning. This he explained is why Brookshire used pit drains rather than hub drains even though the average price of a pit drain, $378.00, far exceeds the average price, $70.00, of a hub drain. He also stated that he disagreed with Mr. Pate on the algae issue, explaining that algae takes sunlight to grow and all the Super One drain pits were dark, as they were covered. Further, he disagreed about the use of grated covers, being of the opinion that they caused women in heels to fall and allowed excessive debris to get into the drain.

Mr. Gregory explained that the units were set to defrost three times a day and that when the unit went into the defrost cycle it would produce one -and-one-half to two gallons of water. The rest of the day, the unit would be in a drip cycle and produce about two gallons of additional water. Although, he couldn't say for sure, Mr. Gregory believed that the unit involved in the accident went into the defrost cycle between 8:00 p.m. and the time of the accident (approximately 8:40 p.m.).

Since there is no allegation that either a Super One employee created the puddle or that Super One had actual knowledge of the puddle, we must determine if Super One should have reasonably known, i.e., had constructive notice, of the puddle. In *Cohen v. Brookshire Bros., Inc.*, 04-916, p. 4 (La.App. 3 Cir. 11/10/04), 887 So.2d 681, 683-84, *writ denied*, 04-3041 (La. 2/18/05), 896 So.2d 38, this court stated:

> The Louisiana Supreme Court examined this definition of constructive notice in *White v. Wal-Mart Stores, Inc*. 97-0393 (La.App.

3 Cir. 9/9/97), 699 So.2d 1081. The court identified a "temporal element," stating that in addition to the plaintiff's burden to prove that the hazard existed at the time of the accident, "[t]he claimant must make a positive showing of the existence of the condition prior to the fall." *Id.* at 1084. The supreme court further explained that a claimant who simply shows that the condition exists, without the additional showing that it existed for some time before the fall, does not carry the burden of proving constructive notice required by the statute. *Id.* "Though the time period need not be specific in minutes or hours, constructive notice requires that the claimant prove the condition existed for some time period prior to the fall." *Id.* at 1084-85. The plaintiff may use circumstantial evidence to establish the temporal element. *Henry v. Wal-Mart Stores, Inc.* 99-1630 (La.App. 3 Cir. 3/1/00), 758 So.2d 327, *writ denied*, 00-929 (La.5/26/00), 762 So.2d 1107.

The proof of constructive notice is not a clear cut issue. Our colleagues of the second circuit offered the following guidance:

> To prove constructive notice, the plaintiff must show that the substance remained on the floor for such a period of time that the defendant would have discovered it by the exercise of ordinary care. *Allen v. Wal-Mart Stores, Inc.*, 37,352 (La.App.2d Cir.06/25/03), 850 So.2d 895, 898. Louisiana R.S. 9:2800.6 does not allow for the inference of constructive notice absent some showing of this temporal element. Whether the period of time is sufficiently lengthy that a merchant should have discovered the condition is necessarily a fact question; however, there remains the prerequisite showing of some time period. A claimant who simply shows that the condition existed without an additional showing that **the condition existed for some time before the fall** has not carried the burden of proving constructive notice as mandated by the statute. *Id.*
>
> In *Allen, supra*, the plaintiff failed to present any evidence that anyone noticed the presence of the liquid on the floor prior to the accident. Nor did the plaintiff present any evidence as to the condition of the liquid after the fact that would suggest that it had been there for some period of time, such as that some areas of the spill had dried, that shopping cart tracks or footprints were in the liquid, or that the liquid was dirty. Furthermore, in *Allen* we rejected the plaintiff's argument that attempted to link the size of the spill [six to seven feet long] with the length of time the spill had existed prior to the accident. Because the plaintiff presented no evidence as to the origin or state of the spill, we concluded that the inference the plaintiff asked the court to draw was merely one possibility that was no more likely than any other potential scenario. *Id.*

9

*Howard v. Family Dollar Store No. 5006*, 40,282, pp. 5-6 (La.App. 2 Cir. 10/26/05), 914 So.2d 118, 121 (emphasis in original).

Although the cause of the puddle in which Mrs Roberts fell was determined, there was no proof offered to support a conclusion that "the condition existed for some time before the fall." No proof was offered as to any footprint or buggy tracks in the water. The water was described as clear and clean by all the witnesses who observed it and the size of the puddle, less than the size of a baking pan (12 x 16 inches; much smaller than the spill in *Allen*) all tend to support a conclusion that the puddle had not been on the floor very long, certainly not "for such a period of time that the defendant would have discovered it by the exercise of ordinary care."

Accordingly, for the reasons stated, the judgment of the trial court is reversed and judgment is rendered in favor of the defendants Brookshire Grocery Company and Nutmeg Insurance Company. All costs of this proceeding are taxed against the plaintiffs, Judy and Albert Roberts.

**REVERSED AND RENDERED.**